IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

KRISTA McCLELLAN,                      )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )          1:18-cv-1083 (LMB/MSN)
                                       )
CITY OF ALEXANDRIA, et al.,            )
                                       )
          Defendants.                  )

MEMORANDUM OPINION

In September 2016, Krista McClellan ("plaintiff"), an opera singer who often performs

on public sidewalks in Alexandria, Virginia ("Alexandria" or the "City"), was arrested for

violating the City's noise ordinance. In response, she filed a five-count complaint against the

City and her arresting officer, Michael Dunkwu ("Dunkwu"). Plaintiff claims that the noise

ordinance, on its face and as applied to her, violates the First Amendment (Count I); that the

ordinance is unconstitutionally vague (Count II) and overbroad (Count III); and that her arrest

violated her rights under the Equal Protection Clause (Count IV) and the Fourth Amendment

(Count V). Counts I through III are asserted against the City only; Counts IV and V are brought

against the City and Dunkwu (together, "defendants").

Defendants have moved to dismiss the complaint for failure to state a claim. After oral

argument on defendants' motion, the Court ruled as to Counts IV and V[1] and took Counts I

through III under advisement [Dkt. No. 32]. For the reasons stated below, defendants' motion to

dismiss will be denied as to Counts I and II and granted as to Count III.

---

[1] The Court granted defendants' motion to dismiss as to Count IV. With respect to Count V, the
Court granted the motion only as to the City, allowing Count V to proceed against Dunkwu.

Plaintiff is an opera singer who has a music degree from Boston University, is a member of the Wagner Society of Washington, D.C., and has performed at the First Lady's Luncheon at the Congressional Club and in several countries around the world. Compl. [Dkt. No. 1] ("Compl.") ¶ 6.[2] More locally, she often performs on public sidewalks in Old Town, Alexandria, with the aid of a small, portable Bluetooth speaker[3] from which she plays accompaniment music. Id. ¶ 7.

On September 2, 2016, at about 7:00 PM, plaintiff began to perform on a public sidewalk near the intersection of King and Lee Streets in Alexandria. Compl. ¶ 15. She was not alone: Other musicians performing in the area that evening included a glass harpist, a guitarist, a saxophonist, a bongoist, and a dulcimerist. Id. ¶ 16. Plaintiff placed her portable speaker inside the small wicker basket she uses to collect tips and set the basket a few feet in front of her on the sidewalk. Id. ¶¶ 17, 19.

Because plaintiff had been performing in downtown Alexandria for years, she was aware that a City ordinance prohibits anyone from generating noise louder than 75 decibels ("dB") as measured from at least 10 feet away. See Compl. ¶¶ 7, 19. She took several precautions to ensure that her singing, together with the accompaniment music played through her speaker, would not exceed that threshold. The night before, her husband had adjusted the levels of the accompaniment tracks such that they would remain under 75 dB, as measured from approximately 10 feet away, when played at maximum volume. Id. ¶ 22. Once she began singing

---

[2] All facts discussed herein are drawn from the allegations in plaintiff's complaint and are assumed to be true for purposes of deciding defendants' motion to dismiss.

[3] The speaker is an Ultimate Ears UE MEGABOOM model and measures approximately 2.5" by 2.5" by 7". Compl. ¶ 17.

that evening, her husband also used a cellphone software application ("app") to measure her sound output from 10 to 15 feet away and confirmed that she was below 75 db. Id. ¶¶ 19-21.

Plaintiff's performance on the night of September 2 started out well. Her husband as well as her mother and young daughter were in attendance, and many people stopped to listen or leave a tip. Compl. ¶¶ 18, 23. Allison Silberberg, Alexandria's former mayor, even stopped to listen at one point; between songs, she complimented plaintiff on her singing and promised to put her in touch with people Silberberg knew at the Washington National Opera. Id. ¶ 24. Silberberg gave plaintiff her business card, which plaintiff deposited in her tip basket. Id.

Things changed around 9:30 PM, when Dunkwu and another City police officer approached plaintiff and demanded that she turn off her speaker. The officers claimed that the City prohibited people from performing on public sidewalks with noise amplification devices. Compl. ¶ 25. Plaintiff declined to turn off the speaker, explaining that she had been performing in Alexandria that way for years and that a week earlier, a different police officer had told her she could perform there. Id. ¶ 26. Dunkwu asked whether plaintiff had a permit to use the speaker; she did not. Id. Plaintiff's husband tried to show Dunkwu that the noise generated by the speaker and plaintiff's singing fell below 75 dB, but Dunkwu refused to look at the app, instead claiming "that if he could hear [plaintiff's] performance from ten to fifteen feet away, then the performance must be in violation" of the City's noise ordinance. Id. ¶ 27.

Dunkwu told plaintiff that if she failed to turn off the speaker, he would issue her a citation. Compl. ¶¶ 29-30. Plaintiff replied that "she understood, and would accept the citation." Compl. ¶ 30. Dunkwu backed off but returned a few minutes later, this time stating that if plaintiff continued to perform, he would forgo the citation and arrest her. Id. ¶¶ 31-32. Plaintiff responded, "I understand," and continued to perform. Id. ¶ 32. Her husband again attempted to

3

come to her aid, telling Dunkwu that arresting plaintiff would constitute a violation of the First Amendment. Id. ¶ 33. Dunkwu responded that plaintiff's husband "better back up" or face an arrest "for obstruction of justice." Id. Plaintiff's husband complied. Id.

Around 9:45 PM—while plaintiff was performing Schubert's Ave Maria—three additional officers arrived, and plaintiff was handcuffed and placed under arrest. Compl. ¶¶ 36-37. When asked why plaintiff had been arrested, Dunkwu responded, "disorderly conduct." Id. ¶ 37. The officers walked plaintiff across the street to where a squad car was parked, patted her down,[4] and placed her in the back of the car. Id. ¶¶ 39-40. Officers seized her speaker, cellphone, and tip basket. Id. ¶ 43.

Plaintiff was taken to a municipal detention center, subject to a second pat-down search, and forced to change into "prison garb." Compl. ¶¶ 46-48. Plaintiff objects that other than a "long-term, convicted inmate," no other individual held in police custody had been forced to change clothes. Id. ¶ 48. Plaintiff also protests that she was forced to change in front of detention staff officers, id. ¶ 49, and that the shoes she was forced to wear were too tight and caused her significant pain, id. ¶ 50.

Around 10:50 PM—roughly an hour after she had been arrested—plaintiff was brought before a magistrate. Compl. ¶ 51. Her hearing lasted about three minutes. See id. ¶ 55. Dunkwu appeared at the hearing and testified that he had booked plaintiff for violating section 11-5-4(b)(2) of the City Code.[5] Plaintiff also testified that she had never had an issue with performing

---

[4] Plaintiff objects that she was searched in public and that the officer conducting the pat-down "moved her hands up and down [plaintiff's] skirt and inner thighs" and "put her hands under [her] bra and displaced it." Compl. ¶ 40.

[5] This provision makes it unlawful to, among other things, use any "device for the producing or reproducing of sound . . . in such manner as to disturb unreasonably the comfort, health, peace,

in that area of downtown Alexandria before, that spectators (including the mayor) had enjoyed her performance, and that she felt her arrest was in violation of the Constitution. Id. ¶ 53. The magistrate ordered that plaintiff be released on her own recognizance; however, officers at the detention center "had difficulty entering the requisite arrest codes into their electronic system, as they had never before seen or used" them, and consequently plaintiff was not actually released until 1:00 AM. Id. ¶¶ 56-58. Detention center officials gave plaintiff back her cellphone but held her basket and speaker overnight. Id. ¶ 60. When plaintiff returned to collect those items the next day, Mayor Silberberg's business card and approximately $60 in tips were missing. Id.

On September 7, 2016, Assistant Commonwealth Attorney Sean Sherlock called plaintiff and left a voicemail stating that the charges against her would be dropped. Id. ¶ 61. The charges were dismissed later that day. Id. Also on September 7, the City issued a press release stating that plaintiff "should have first been [issued] a civil notice" and quoting the city manager as saying, "I would like to publicly apologize to [plaintiff] for the way this situation was handled . . . . While we are obligated to enforce certain restrictions, we did not follow the correct procedure in this case." Id. Ex. B. The press release also stated that the City would review plaintiff's arrest as well as "the general application of noise ordinances to street performers, so that performers, enforcement staff, and the community have a clear understanding of the rules." Id. Ultimately, the City produced a memorandum to the chief of the Alexandria Police Department providing detailed guidance on the City Code's noise control provisions. Compl. Ex. C.

Plaintiff alleges that her arrest caused her a wide range of physical, psychological, emotional, and personal harms. She had a miscarriage in late September or early October 2016

---

safety, or welfare and environment of the neighboring inhabitants." Alexandria, Va., City Code § 11-5-4(b)(2). The City's noise ordinance is discussed in greater detail below.

and suffered heavy uterine bleeding that required surgery to correct. Compl. ¶ 64. She was bedridden with anxiety and depression, was prescribed Xanax, and was referred to a psychiatrist, who "provided her with educational materials concerning post-traumatic stress disorder and severe anxiety." Id. ¶¶ 66-67. Plaintiff suffered from preexisting foot conditions, including "plantar fasciitis, bursitis, and ligamentous laxity," which she claims were aggravated by being forced to wear shoes that were too tight while she was held in the municipal detention center. Id. ¶¶ 68-69. Plaintiff also avers that her arrest caused her reputational and stigmatic harm, reducing the frequency with which she has been hired to sing at private events and causing her considerable anxiety anytime she performs in public. Id. ¶ 70. She also claims that for months after her arrest, police officers would constantly "hover near her" whenever she performed in downtown Alexandria, scaring away pedestrians and reducing her tips. Id. ¶ 71. As a result, plaintiff claims her income was reduced to such an extent that she and her family were homeless for over a month and had to rely on emergency food providers and personal loans. Id. ¶¶ 72-73.

B.

In Count I of her five-count complaint, plaintiff alleges that the City's noise ordinance, both on its face and as applied to her, violates her rights under the Free Speech Clause of the First Amendment. Counts II and III allege that the City's noise ordinance is void for vagueness and overbroad, respectively. Counts IV and V, asserted against both defendants, allege that plaintiff's arrest violated the Equal Protection Clause and the Fourth Amendment, respectively.

Defendants moved to dismiss all five counts of the complaint under Federal Rule of Civil Procedure 12(b)(6). After oral argument on defendants' motion, Count IV was dismissed because plaintiff had failed to allege adequate facts to support her "class of one" equal protection claim. Count V was dismissed as to the City because plaintiff had failed to state a claim for failure to

train under <u>City of Canton v. Harris</u>, 489 U.S. 378 (1989), but was allowed to proceed against

Dunkwu. Finally, Counts I through III were taken under advisement.

II.

Title 11, Chapter 5 of the City Code is known as the "Noise Control Code." As relevant

here, the Noise Control Code contains two sets of regulations: One general set of provisions

applies to the entire city, and a more specific set of provisions applies only in an area known as

the "central business district." The parties disagree about which provisions governed plaintiff's

conduct on the night she was arrested, a fundamental issue that affects the analysis of

defendants' motion to dismiss. Accordingly, the precise nature and interaction of the city-wide

and central business district-specific provisions must be analyzed before defendants' motion as

to Counts I through III may be addressed.

A.

The city-wide provisions declare it "unlawful for any person to make, continue, or cause

to be made any excessive, unnecessary or unusually loud noise or any noise which unreasonably

annoys, disturbs, injures or endangers the comfort, health, safety, welfare, or environment of

others." Alexandria, Va., City Code ("Code") § 11-5-4(a). Section 11-5-4 contains a

nonexhaustive list of acts "declared to be unlawful" in the city. <u>Id.</u> § 11-5-4(b). Among these are

"[t]he using or operating of any . . . machine or device for the producing or reproducing of sound

. . . in such manner as to disturb unreasonably the comfort, health, peace, safety, or welfare and

environment of the neighboring inhabitants." <u>Id.</u> § 11-5-4(b)(2).

Another of the city-wide sections provides a list of standards that "shall be considered in

determining whether a violation of this chapter exists." Code § 11-5-3. These include the "level

of noise"; "whether the nature of the noise is usual or unusual"; "whether the origin of the noise

7

is natural or unnatural"; how close the noise is "to residential sleeping facilities"; the nature, zoning, and density of the area within which the noise emanates; the time of day the noise occurs; the duration, intensity, and frequency of the noise; and "whether the noise is produced by a commercial or noncommercial activity." Id. The Noise Control Code makes clear that this list is nonexhaustive. See id.

The city-wide provisions also contain exemptions. Several relate to public utilities and public safety. See Code § 11-5-6. Another allows the city manager to issue permits for otherwise unlawful noise "on the basis of undue hardship" if the manager (or his designee) concludes that the applicant needs additional time to conform his noise-producing activity to the law or that the noisy activity is unavoidable or temporary. Id. § 11-5-7(a). If the city manager grants a permit, he "may prescribe any conditions or requirements he deems necessary to minimize adverse effects upon the community or the surrounding neighborhood." Id. § 11-5-7(b). No permit may remain in force for more than three years. Id. § 11-5-7(c).

Finally, the city-wide provisions create two forms of penalties. Anyone who violates the Code is liable for a civil fine of $50, with escalating fines for repeat offenders. Code § 11-5-12(a). And "[a]ny person who knowingly refuses or neglects to comply with any written order to cease or abate any violation of this chapter, issued by an authorized enforcement officer, shall be guilty of a class 2 misdemeanor." Id. § 11-5-12(b).

B.

The Noise Control Code designates the City's "special business district," which comprises a roughly 60-square-block area of downtown Alexandria, see Compl. Ex. C [Dkt. No. 1-3] 4, for special treatment. Section 11-5-4.1 provides in pertinent part: "Notwithstanding any conflicting provision of this chapter or other law, it shall be unlawful for any person to

8

engage in . . . any sound generation, as defined in this section, in or on any public or private street, sidewalk or alley . . . within the central business district." Code § 11-5-4.1(a). "Sound generation," in turn, is defined as "any conduct, activity or operation, whether human, mechanical, electronic or other, . . . which produces or generates sound in excess of the volume levels . . . specified in this section." Id. § 11-5-4.1(b). Those volume levels are as follows:

> Between the hours of 7:00 a.m. and 11:00 p.m., . . . no sound generation shall result in sound having a volume of 75 db(A)[6] or more, at a distance greater than 10 feet from the place at which the sound is being generated or produced, for an aggregate duration of time greater than 60 seconds in any one[-]hour period. Any sound that is plainly audible above the background noise level to a person of normal hearing acuity at a distance greater than 50 feet from the place at which the sound is being generated or produced shall be presumed to exceed 75 db(A) at 10 feet of distance and thus violate this subsection, and the burden shall be on the person responsible for such sound generation to prove otherwise.

> Between the hours of 11:00 p.m. and 7:00 a.m., no sound generation shall exceed a volume of 65 db(A) at a distance greater than 10 feet from the place at which the sound is being generated or produced, for an aggregate duration of 60 seconds between such hours. Any sound that is plainly audible above the background noise level to a person of normal hearing acuity at a distance greater than 50 feet from the place at which the sound is being generated or produced shall be presumed to exceed 65 db(A) at 10 feet of distance and thus violate this subsection, and the burden shall be on the person responsible for such sound generation to prove otherwise.

Id. § 11-5-4.1(c)-(d). Thus, section 11-5-4.1 employs two types of standards for unlawful noise within the central business district: a decibel threshold to be measured with an approved device from more than 10 feet away and a statutory presumption based on "normal hearing acuity". See also id. § 11-5-4.1(*i*) (providing that a violation may be proved by evidence demonstrating that either or both standards had been met).

---

[6] Under the Noise Control Code, "db(A)" means "A-weighted sound level"—that is, the "quantity, in decibels read from a sound level meter . . . that is switched to the weighting network labeled 'A'" according to the American National Standards Institute ("ANSI"). Code § 11-5-2(4). "Sound level meter," in turn, is defined as "[a]n instrument comprising a microphone, amplifier, and output meter, and frequency weighting networks, that is used for the measurement of sound levels in a manner specified by the [ANSI]." Id. § 11-5-2(40).

C.

There is no doubt that on the night plaintiff was arrested, she was performing within the central business district. The more challenging question is which of the Noise Control Code's provisions governed her noise-generating conduct that night. This appears to be an issue of first impression, as the parties have not cited, and independent research has not revealed, any federal or state case law addressing the current version of the Noise Control Code.[7]

One aspect of that question is easily answered: Section 11-5-4.1 applies "[n]otwithstanding any conflicting provision of this chapter of other law," Code § 11-5-4.1(a), so plaintiff faced liability for making noise that (i) exceeded 75 db as measured from over 10 feet away or (ii) was plainly audible to a person of normal hearing acuity from over 50 feet away. See id. § 11-5-4.1(c). Another question remains: To what extent was plaintiff also subject to the other, city-wide provisions of the Noise Control Code? That is, does section 11.5.4-1 wholly supplant the Code's city-wide provisions within the central business district, or do the city-wide provisions also apply within the district unless they squarely conflict with section 11.5.4-1's terms? Put another way: Is the Code's carve-out in section 11-5-4.1 more like field preemption or conflict preemption?

---

[7] In Davenport v. City of Alexandria, 710 F.2d 148 (4th Cir. 1983) (en banc), the Fourth Circuit considered a constitutional challenge brought by a bagpipe performer against an earlier ordinance that generally prohibited all performances or exhibitions on public sidewalks in Alexandria's central business district. See id. at 148-49. The district court found that the ordinance violated the First Amendment in part because it was not narrowly tailored, but a panel of the Fourth Circuit reversed. See Davenport v. City of Alexandria, 683 F.2d 853, 855, 857 (4th Cir. 1982). The Fourth Circuit then granted review en banc, vacated the panel decision, and remanded to the district court for additional factfinding on the narrow tailoring issue. Davenport, 710 F.2d at 149, 152-53. After the district court conducted an additional evidentiary hearing and reaffirmed the finding that the ordinance was not narrowly tailored, the Fourth Circuit affirmed. See Davenport v. City of Alexandria, 748 F.2d 208, 209-10 (4th Cir. 1984).

The best reading of the Code is that people making noise in the central business district are subject to liability under both the city-wide and district-specific provisions. The most compelling evidence is that the city council used the phrase "notwithstanding any conflicting provision," Code § 11-5-4.1(a) (emphasis added). In common parlance, the term "conflicting" denotes "collision" between "incompatible" ideas,[8] and in the law it evokes conflict preemption, which applies only "where compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Oneok, Inc. v. Learjet, Inc., 135 S. Ct. 1591, 1595 (2015) (internal quotation marks and citation omitted). That the city council used such a term in enacting section 11-5-4.1 is strong evidence that it wished to displace the city-wide provisions only where strictly necessary.

Several provisions within section 11-5-4.1 reinforce this conclusion. Section 11-5-4.1(*i*)(2), for instance, provides that sound level measurements under section 11-5-4.1 "need not comply with the provisions of section 11-5-5," a city-wide provision that (among other things) specifies procedures for measuring sound. That clarification would be unnecessary, indeed nonsensical, had the city council thought that section 11-5-4.1 would operate as a universe unto itself.[9] Likewise, although section 11-5-4.1 specifies a few definitions or procedures not included in the city-wide provisions, see, e.g., Code § 11-5-4.1(b), (g), it otherwise relies on the city-wide

---

[8] Conflicting, Merriam-Webster, https://tinyurl.com/y7gxt5sc (last visited Jan. 25, 2019); see also Conflicting, Oxford Eng. Dictionary, https://tinyurl.com/ycfz43b2 (last visited Jan. 25, 2019) ("clashing, contradictory, at variance").

[9] Section 11-5-4.1(e)(4) exempts from liability any sound generated "under a special permit . . . issued by the city manager pursuant to section 11-5-7." Although it could be said that this provision suggests that the city-wide provisions do not apply in the central business district unless otherwise specified, the more logical conclusion is that the city council simply wanted to make clear that there was no "conflict[]" in allowing noise to be generated under a special permit in excess of section 11-5-4.1's decibel threshold.

provisions for definitions, enforcement procedures, penalties, and the like. The statutory context makes clear that section 11-5-4.1 provides additional noise control provisions, and does not displace, the city-wide provisions in the remainder of the Noise Control Code.[10]

In sum, a person in the central business district is subject to liability for making unlawful noise as defined not only in section 11-5-4.1, but also in section 11-5-4. In practical terms, this means that plaintiff can be said to have violated the Noise Control Code on the night of September 2, 2016 to the extent she was generating sound that (i) was in excess of 75 db as measured from more than 10 feet away, Code § 11-5-4.1(c); (ii) was plainly audible above background noise to a person of normal hearing from more than 50 feet away, id.; (iii) was emitted through a sound reproduction device "in such manner as to disturb unreasonably the comfort, health, peace, safety, or welfare and environment of the neighboring inhabitants," id. § 11-5-4(b)(2); (iv) was "excessive, unnecessary or unusually loud," id. § 11-5-4(a); or (v) "which unreasonably annoy[ed], disturb[ed], injure[d] or endanger[ed] the comfort, health, safety, welfare, or environment of others," id.[11]

### III.

A complaint should be dismissed under Rule 12(b)(6) if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

---

[10] This construction is consistent with the guidance prepared by the City for the benefit of the Alexandria Police Department. See Compl. Ex. C [Dkt. No. 1-3] 1 (stating that city-wide provisions apply to "all areas within the City" (capitalization altered)).

[11] To further illustrate: A person making noise in the central business district in excess of the 75-db threshold may not escape liability by arguing that the noise did not violate section 11-5-4, but a person making noise in the central business district under the 75-db threshold may nonetheless violate the Noise Control Code if the noise is "excessive, unnecessary or unusually loud" or otherwise violates the city-wide provisions.

plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." Id. The plausibility standard "is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

Id. (quoting Twombly, 550 U.S. at 570). The Court must "assume the facts alleged in the

complaint are true and draw all reasonable factual inferences in [the plaintiff's] favor," Burbach

Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 406 (4th Cir. 2002), but only to the

extent those allegations pertain to facts rather than legal conclusions. Iqbal, 556 U.S. at 678-79.

A.

Plaintiff's performances on public sidewalks in Alexandria's central business district

constitute core First Amendment activity. "Live entertainment is protected speech" even if it

"generates a profit." Davenport v. City of Alexandria, 710 F.2d 148, 150 n.6 (4th Cir. 1983)

(en banc); see also Ward v. Rock Against Racism, 491 U.S. 781, 790 (1989) ("Music, as a form

of expression and communication, is protected under the First Amendment."). And a public

sidewalk is a "prototypical example[]" of a traditional public forum open to such expression.

Warren v. Fairfax County, 196 F.3d 186, 190 (4th Cir. 1999). Thus, the First Amendment

standard governing Count I of plaintiff's complaint is undisputed[12]:

---

[12] Although plaintiff's complaint suggested that the Noise Control Code was content based,
Compl. ¶ 78, it appears she has abandoned that argument and now agrees that the applicable
standard is the intermediate scrutiny applied to content-neutral laws governing the time, place, or
manner of protected speech. See Pl. Krista McClellan's Br. in Opp'n to Defs.' Mot. to Dismiss
[Dkt. No. 23] ("Pl.'s Opp'n") 8. Plaintiff is wise to do so: Laws aimed at restricting loud,
disruptive, or otherwise excessive speech are content neutral, see March v. Mills, 867 F.3d 46,
55-57 (1st Cir. 2017), cert. denied, 138 S. Ct. 1545 (2018), because they do not "depend entirely
on the communicative content of" the speech in question, Reed v. Town of Gilbert, 135 S. Ct.
2218, 2227 (2015). (Plaintiff does not argue that the Noise Control Code "cannot be justified

13

[T]he government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

Ward, 491 U.S. at 791 (internal quotation marks and citation omitted).

Similarly well settled is that the City has "a substantial interest in protecting its citizens from unwelcome noise." Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 805-06 (1984). That interest is at its apex when it comes to protecting the "well-being, tranquility, and privacy of the home," Frisby v. Schultz, 487 U.S. 474, 484 (1988) (citation omitted), but remains significant even when it comes to "protect[ing] such public forums as city as streets and parks from excessive noise," Ward, 491 U.S. at 796.

Defendants' motion to dismiss Count I thus turns on whether the challenged provisions of the Noise Control Code are narrowly tailored to serve the City's interest and leave ample alternatives channels of communication. Those questions are highly fact-intensive. Grayned v. City of Rockford, 408 U.S. 104, 116 (1972) ("The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time."); see, e.g., Hickory Fire Fighters Ass'n, Local 2653 v. City of Hickory, 656 F.2d 917, 924 (4th Cir. 1981) ("That inquiry in turn requires careful consideration of highly particularized facts, such as the length or length of city blocks, sidewalk widths, and traffic patterns at various times and places around town."); see also Davenport, 710 F.2d at 151 (remanding for additional factfinding on whether an earlier Alexandria noise ordinance was narrowly tailored).

---

without reference to the content of the regulated speech" or was "adopted by the government because of disagreement with the message [the speech] conveys," Reed, 135 S. Ct. at 2227 (alteration in original) (internal quotation marks and citation omitted).)

1.

The requirement that content-neutral laws governing the time, place, or manner of speech in a traditional public forum be narrowly tailored does not require that such laws be "the least restrictive or least intrusive means" of advancing the government's interest; rather, they must not "burden substantially more speech than is necessary to further the government's legitimate interests." Reynolds v. Middleton, 779 F.3d 222, 225-26 (4th Cir. 2015) (quoting McCullen v. Coakley, 134 S. Ct. 2518, 2535 (2014)). The narrow tailoring requirement serves two important functions: It "guard[s] against an impermissible desire to censor" and, "by demanding a close fit between ends and means, . . . prevents the government from too readily 'sacrific[ing] speech for efficiency.'" McCullen, 134 S. Ct. at 2534 (third alteration in original) (citation omitted).

Assuming as true all allegations in her complaint, plaintiff has adequately alleged that the Noise Control Code is not narrowly tailored.[13] To begin, plaintiff alleges that the noise she and her portable speaker were generating on the night of September 2, 2016 was below section 11-5-

---

[13] Plaintiff's complaint asserts both facial and as-applied First Amendment challenges to the Noise Control Code. See Compl. ¶¶ 78-83. A facial challenge, which must be assessed "without regard to [the law's] impact on the plaintiff asserting the facial challenge," may proceed only on one of two theories: either that "no set of circumstances exists under which the law would be valid" or that "the law is overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." See Educ. Media Co. at Va. Tech, Inc. v. Insley, 731 F.3d 291, 298 n.5 (4th Cir. 2013) (internal quotation marks and citation omitted). Conversely, an as-applied challenge "is based on a developed factual record and the application of a statute to a specific person." Id. (citation omitted).

Plaintiff does not suggest that the Noise Control Code "lacks any plainly legitimate sweep," Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt., 721 F.3d 264, 282 (4th Cir. 2013) (citation omitted); rather, she argues that the Code is facially unconstitutional because its "legitimate reach is dwarfed by the overbreadth of its . . . applications." Pl.'s Opp'n 14. Accordingly, her facial First Amendment challenge and her overbreadth challenge in Count III are one and the same, and the Court's discussion of Count I will be limited to her as-applied First Amendment challenge.

4.1(c)'s 75-db threshold.[14] More importantly, she alleges that her performance was not dangerously loud, disturbing, annoying, or disruptive, but rather was pleasant, relatively quiet, and appreciated by many of the passersby—including the City's former mayor, who presumably shares the City's asserted interest in keeping its downtown area free of auditory nuisances. Further, the performance took place in the central business district, a place with significant foot and motor vehicle traffic, businesses, pedestrians, and even other performers. The nature of the situs of the protected speech is always relevant for purposes of analyzing narrow tailoring. Although the interest in preventing "excessive," Ward, 491 U.S. at 796, or "unwelcome," Taxpayers for Vincent, 466 U.S. at 806, noise does not disappear in bustling areas, the government must appropriately tailor its restrictions to the nature of those areas. Plaintiff has alleged sufficient facts indicating that the City failed to narrowly tailor its noise ordinance, and accordingly Count I may go forward.

2.

To survive intermediate scrutiny, the Noise Control Code must also "leave open ample alternative channels for communication." Ward, 491 U.S. at 791. Although the available alternatives "need not be the speaker's first or best choice or provide[] the same audience or impact for the speech," the challenged law must nonetheless "provide[] avenues for the more general dissemination of a message." Ross v. Early, 746 F.3d 546, 559 (4th Cir. 2014) (first alteration in original) (internal quotation marks and citations omitted).

---

[14] Whether plaintiff actually exceeded the 75-db threshold has no direct bearing on the First Amendment analysis at this stage: Even if the Court were to assume that she had exceeded the threshold, her First Amendment claim could nonetheless proceed because her factual allegations would indicate that the threshold was too low for the central business district and therefore failed to "take[] into account the nature and traditional uses" of the situs in question. See, e.g., United States v. Doe, 968 F.2d 86, 90-91 (D.C. Cir. 1992) (holding that an ordinance restricting noise in Lafayette Park beyond 60 db, as measured at 50 feet, was not narrowly tailored).

The City advances two arguments for why the Noise Control Code leaves sufficient alternative channels. First, it argues that because section 11-5-4.1 employs a decibel threshold, the Code leaves open enough alternative channels—or as the City puts it, "if Plaintiff wishes to perform[,] . . . she 'need only lower the volume to comply.'" Reply in Supp. of Mot. to Dismiss by Defs. City of Alexandria & Sergeant Michael Dunkwu [Dkt. No. 26] ("Defs.' Reply") 4 (quoting Ward, 491 U.S. at 802).

This argument fails for two independent reasons. To begin, it is far from clear that plaintiff's arrest had anything to do with the 75-db threshold. She alleges that she took precautions designed to ensure that her performance remained under that threshold, and nothing in the facts (as pleaded) indicates otherwise. Plaintiff's description of Dunkwu's comments to her on the night of the arrest—that she was violating the City's noise ordinance not because she was over 75 db, but rather because she was using a speaker without a permit and because her performance was audible from 10 to 15 feet away—supports her claim. Indeed, when she was brought before a magistrate, she was charged with violating section 11-5-4(b)(2)—that is, for using a sound reproduction device "in such manner as to disturb unreasonably the comfort, health, peace, safety, or welfare and environment of the neighboring inhabitants." Plaintiff's allegations, if proved, would indicate that she was arrested while making noise below the threshold, which gives the lie to defendants' claim that all she had to do to comply with the ordinance was to lower her volume. Moreover, even assuming plaintiff had exceeded the 75-db threshold, the Noise Control Code could nonetheless deprive her of ample alternative channels if (as she alleges) the threshold was unreasonably low and thus precluded her from exercising her First Amendment right to speak (or sing) freely in a reasonable way.

Next, the City argues that the Noise Control Code provides ample alternative channels because it allows speakers to apply for special permits. It is true, as the City point out, that a permitting system, particularly in combination with other alternatives, may enable a content-neutral restriction on speech to pass constitutional muster. See, e.g., Bruce & Tanya & Assocs., Inc. v. Bd. of Supervisors, No. 1:17-cv-1155, 2018 WL 6037532, at *13 (E.D. Va. Nov. 16, 2018); see also Marcavage v. City of New York, 918 F. Supp. 2d 266, 274-75 (S.D.N.Y. 2013). But that may not always be the case. Under the Noise Control Code's provision, no permit may be granted unless the city manager or his designee determines (i) "that additional time is necessary for the applicant to alter or modify his activity or operation to comply" with the law; or (ii) that "the activity, operation or noise source will be of temporary duration, or cannot be done in a manner that would comply with other subsections of th[e Noise Control Code], and that no other reasonable alternative is available to the applicant." Code § 11-5-7(a). Anyone granted a special permit must abide by whatever "conditions or requirements" the city manager may deem "necessary to minimize adverse effects upon the community or the surrounding neighborhood." Id. § 11-5-7(b). Whether section 11-5-7 provides a sufficient alternative channel for communication requires further development of the record and cannot be resolved at this stage. Therefore, the City's motion to dismiss Count I will be denied.

## B.

In Count II, plaintiff asserts that the Noise Control Code is unconstitutionally vague. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012). A statute is too vague to be enforced consistent with due process principles if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited"

or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." Id. (citation omitted). Moreover, "[w]hen speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." Id. at 253-54. Nonetheless, courts "can never expect mathematical certainty from . . . language," and the Due Process Clause simply requires that reasonably intelligent people be able to understand "what the ordinance as a whole prohibits." Hill v. Colorado, 530 U.S. 703, 733 (2000) (quoting Grayned, 408 U.S. at 110).

The City's argument that it is entitled to dismissal of Count II hinges on its theory that the only relevant element of the Noise Control Code is the 75-db threshold. See Defs.' Reply 5-8. That view of the issue is misguided. To be sure, one of the provisions governing plaintiff's speech on the night she was arrested was a 75-db threshold. But the City ignores the fact that plaintiff was subject to other provisions of the Code as well. Anyone performing in the central business district hoping to avoid civil or criminal liability must ensure not only that the sound she generates remains under the 75-db threshold as measured from over 10 feet away, Code § 11-5-4.1(c), but also that the sound is not "plainly audible above the background noise level to a person of normal hearing acuity at a distance greater than 50 feet," id.; that any speaker or amplifier she is using does not "disturb unreasonably the comfort, health, peace, safety, or welfare and environment of the neighboring inhabitants," id. § 11-5-4(b)(2);[15] and that her performance does not involve "any excessive, unnecessary or unusually loud noise or any noise which unreasonably annoys, disturbs, injures or endangers the comfort, health, safety, welfare, or

---

[15] The Noise Control Code further provides that any sound reproduction device used between 11:00 PM and 7:00 AM "in such manner as to be plainly audible across property boundaries at a distance of 50 feet from the building, structure or vehicle in which it is located shall be prima facie evidence of a violation." Code § 11-5-4(b)(2).

environment of others," id. § 11-5-4(a). At all times, she must also keep in mind at least ten

statutory standards that could affect "whether a violation of th[e Noise Control Code] exists." Id.

§ 11-5-3.

The City correctly points out that many of the elements of its Noise Control Code—at

least in isolation—have withstood constitutional challenges. See, e.g., Grayned, 408 U.S. at 107-

14 (holding that an ordinance prohibiting anyone "adjacent to" any school building from making

noise that "disturbs or tends to disturb the peace or good order of such school session" was not

unconstitutionally vague); Munn v. City of Ocean Springs, 763 F.3d 437, 440 (5th Cir. 2014)

(upholding a provision prohibiting "noise that annoys . . . a reasonable person of ordinary

sensibilities"); DA Mortg., Inc. v. City of Miami Beach, 486 F.3d 1254, 1271-72 (11th Cir.

2007) (upholding a provision barring the use of sound reproduction devices so "as to disturb the

peace, quiet and comfort of the neighboring inhabitants" or "with louder volume than is

necessary for convenient hearing" for voluntary listeners); Howard Opera House Assocs. v.

Urban Outfitters, Inc., 322 F.3d 125, 128 (2d Cir. 2003) (upholding a provision prohibiting "loud

or unreasonable noise" that "disturbs, injures or endangers the peace or health of another or . . .

endangers the health, safety or welfare of the community"); Jim Crockett Promotion, Inc. v. City

of Charlotte, 706 F.2d 486, 489-90 (4th Cir. 1983) (rejecting a vagueness challenge to portions

of a city ordinance prohibiting "unreasonably loud" or "disturbing" noise).

Yet other features of the Code have been held to be constitutionally problematic. See,

e.g., Jim Crockett Promotion, 706 F.2d at 489 (affirming the district court's ruling that a

provision prohibiting "unnecessary" noise was unconstitutionally vague); Hampsmire v. City of

Santa Cruz, 899 F. Supp. 2d 922, 938-39 (N.D. Cal. 2012) (finding unconstitutionally vague a

city ordinance restricting noises that "are not necessary in connection with an activity which is

otherwise lawfully conducted"); <u>Dupres v. City of Newport</u>, 978 F. Supp. 429, 433-34 (D.R.I. 1997) (collecting cases and finding that although a decibel-limit provision passed constitutional muster, others barring "any unreasonably loud, disturbing, or unnecessary noise," noise "detrimental to the life, health, or welfare of any individual," and noise that "annoys, disturbs, injures, or endangers the comfort, repose, peace, or safety of any individual" did not); <u>Tanner v. City of Virginia Beach</u>, 674 S.E.2d 848, 853 (Va. 2009) (holding that a provision prohibiting "unreasonably loud, disturbing and unnecessary noise" that is "detrimental to the life or health of persons of reasonable sensitivity" or that "disturb[s] or annoy[s] the quiet, comfort or repose of reasonable persons" was unconstitutionally vague). The City does not offer a cogent response to this line of cases.

Because the Noise Control Code includes some provisions employing vague, standardless language that may fail to satisfy the notice and separation-of-powers principles undergirding the vagueness doctrine, and because the Code contains multiple and overlapping types of noise regulations that may prove difficult for laymen to understand, defendants' motion to dismiss Count II will be denied.

## C.

In Count III, plaintiff brings a facial First Amendment challenge claiming that the Noise Control Code is overbroad. The overbreadth doctrine holds that "a statute violates the First Amendment if it prohibits a substantial amount of protected expression." <u>Legend Night Club v. Miller</u>, 637 F.3d 291, 294 (4th Cir. 2011) (citation omitted). The doctrine flows from the principle that an overly sweeping statute "has the potential to repeatedly chill the exercise of expressive activity by many individuals." <u>Taxpayers for Vincent</u>, 466 U.S. at 801. If a law "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly

legitimate sweep," it is wholly invalid "until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." Doe v. Cooper, 842 F.3d 833, 845 (4th Cir. 2016) (quoting Virginia v. Hicks, 539 U.S. 113, 118-19 (2003)).

"[T]he overbreadth doctrine is 'strong medicine' to be applied 'sparingly and only as a last resort.'" Am. Life League, Inc. v. Reno, 47 F.3d 642, 652-53 (4th Cir. 1995) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973)). It is not enough for a plaintiff to demonstrate that the challenged law was unconstitutional as applied to her; instead, she must show that the law "reaches a substantial number of impermissible applications" and that this overbreadth is "not only . . . real, but substantial as well." Am. Entertainers, L.L.C. v. City of Rocky Mount, 888 F.3d 707, 715 (4th Cir. 2018) (alteration in original) (citation omitted). The Supreme Court has put it bluntly: "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." Taxpayers for Vincent, 466 U.S. at 800.

Plaintiff has failed to satisfy her pleading burden with respect to Count III, which is little more than a retooled version of the vagueness argument presented in Count II.[16] Plaintiff points to the Noise Control Code's general, standards-based language and asserts, in a conclusory fashion, that the Code "burdens a great deal more speech than is essential" and "undoubtedly applies to a range of protected activity." Pl. Krista McClellan's Br. in Opp'n to Defs.' Mot. to Dismiss [Dkt. No. 23] 15-16. This is insufficient to survive a Rule 12(b)(6) motion. Because

---

[16] Although "vagueness and overbreadth [are] logically related and similar," Kolender v. Lawson, 461 U.S. 352, 358 n.8 (1983), they remain "separate and distinct doctrines, subject in application to different standards and intended to achieve different purposes," United States v. Morison, 844 F.2d 1057, 1070 (4th Cir. 1988).

overbreadth is only used as a last resort, courts routinely dismiss overbreadth claims where the plaintiff "fail[s] to demonstrate a realistic danger that the ordinance will significantly compromise recognized First Amendment protections of individuals not before the Court." Taxpayers for Vincent, 466 U.S. at 802; see, e.g., Howard Opera House Assocs. v. Urban Outfitters, Inc., 131 F. Supp. 2d 559, 564 (D. Vt. 2001) (dismissing an overbreadth challenge where the plaintiff "t[ook] issue with the ordinance's lack of standards" and "the unfettered discretion accorded to enforcing officers" but "failed to identify any significant difference between [its] claim that the ordinance is invalid on overbreadth grounds and [its] claim that it is unconstitutional when applied" (second and third alterations in original) (citation omitted)), aff'd, 322 F.3d 125 (2d Cir. 2003). That principle governs here, and accordingly defendants' motion to dismiss as to Count III will be granted.

IV.

For the reasons stated above, defendants' motion to dismiss will be denied as to Counts I and II and granted as to Count III by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 28th day of January, 2019.

/s/

Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

23